433 F.2d 686
 CARL ZEISS STIFTUNG, doing business under the name and style of Carl Zeiss, and Zeiss Ikon A.G., Plaintiffs-Appellees,
v.
VEB CARL ZEISS JENA, Steelmasters, Inc., and Ercona Corporation, Defendants-Appellants.
 No. 767.
 Docket 33676.
 United States Court of Appeals, Second Circuit.
 Argued May 5, 1970.
 Decided November 2, 1970.
 
 1
 COPYRIGHT MATERIAL OMITTED Milbank, Tweed, Hadley & McCloy, New York City (William E. Jackson, Isaac Shapiro, Walter J. Derenberg, Von Maltitz, Derenberg, Kunin & Janssen, New York City, of counsel), for plaintiffs-appellees.
 
 
 2
 Botein, Hays, Sklar & Herzberg, New York City (Harry I. Rand, Donald E. Nawi, David Kremen, New York City, of counsel), for defendants-appellants.
 
 
 3
 Before LUMBARD, Chief Judge, WATERMAN, Circuit Judge, and JAMESON, District Judge.*
 
 JAMESON, District Judge:
 
 4
 This trademark infringement action involves the ownership and use in the United States of the "Zeiss" and "Zeiss Ikon" names and marks on optical and mechanical precision instruments. Plaintiffs-appellees are the Carl Zeiss Stiftung (or Foundation) doing business under the name of Carl Zeiss, located in Heidenheim, West Germany, and its subsidiary, Zeiss Ikon A.G., located in Stuttgart, West Germany. The defendants-appellants are VEB[1] Carl Zeiss Jena, located in East Germany, and two of its distributors in the United States, Steelmasters, Inc., and Ercona Corporation.[2]
 
 
 5
 Appellees claim ownership and the right to exclusive use of the trademarks as a successor of the original Carl Zeiss Stiftung (Foundation) created in Jena in 1889. Appellants claim the right to exclusive use, or in the alternative the right to concurrent use, as the assignees and licensees of the Jena Foundation.
 
 
 6
 The district court held that the appellee Heidenheim Foundation was identical to the Carl Zeiss Stiftung and was therefore entitled to the exclusive use of the "Zeiss" name and trademarks in the United States; that Zeiss Ikon A.G. was entitled to the exclusive use of the "Zeiss Ikon" name and mark in the United States; and that since 1953 appellants had infringed those trademarks and had violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by describing and designating goods they had imported from Jena and sold in the United States as goods produced by a licensee of the Zeiss Stiftung. The court rejected the defenses of laches, acquiescence and abandonment; held that the appellants were barred from asserting any claim to ownership of the "Zeiss" name and marks by provisions of Section 5(b) of the Trading With The Enemy Act (50 U.S.C. App. § 1 et seq.) and regulations promulgated thereunder (8 C.F.R. § 507.46); and struck the antitrust defense asserted by the appellants.
 
 
 Statement of Facts with Respect to Ownership and Use of Trademarks
 
 
 7
 The basic facts as set forth in the court's formal findings and supplemental discussion with respect to the ownership and use of the trademarks[3] may be summarized as follows:
 
 
 8
 In 1846 Carl Zeiss established a workshop for the manufacture of optical and mechanical precision instruments in Jena in the Grand Duchy of Saxe-Weimar-Eisenach.[4] In 1875, Dr. Ernst Abbe, a mathematician and physicist teaching at the University of Jena, joined Zeiss as a partner. In 1884, with Otto Schott, they organized the companion Schott Works for the manufacture of optical and other types of glass.
 
 
 9
 In 1889 the Carl Zeiss Stiftung was created in Jena with the required approval of the Duchy of Saxe-Weimar-Eisenach. In 1891 all assets of the Zeiss firm were conveyed to the Carl Zeiss Stiftung (FF 10) and since then the Foundation has been the sole owner of the Zeiss firm (FF 11). JA 817. In 1896 a new basic governing instrument designated a "Statute" was prepared and approved.[5] The statute was amended from time to time, the last time in 1941.
 
 
 10
 The Carl Zeiss Foundation was not charitable or public in nature, but was established as a private foundation for the purpose of owning and operating the Zeiss optical business for profit.[6] The profits were to be used primarily to maintain, develop and increase the business enterprises and to provide economic benefits for the workers. Any surplus was to be used for promotion of technical knowledge and science outside of the works, and for participation in community organizations and measures intended to help the working population in Jena, where the works were then located.
 
 
 11
 The Zeiss and Schott firms were each under the direction of a separate "Board of Management." A "Special Board" was to administer the nonindustrial assets of the Foundation and to supervise the noncommercial activities. A "Foundation Deputy" appointed by the Special Board was to represent it on the Boards of Management of the individual commercial enterprises.[7]
 
 
 12
 Between 1891 and 1945 the Foundation acquired interests in numerous other commercial enterprises, including the Schott firm and Zeiss Ikon A.G. Since the early 1900s (with interruptions during the two World Wars) the Zeiss firm has sold high quality optical and other scientific instruments in the United States under the Zeiss name and the trademarks "Zeiss," "Carl Zeiss Jena," "C.Z." and others. Zeiss Ikon has sold photographic and related equipment in the United States since 1926 under the "Zeiss Ikon" and other names and marks.[8]
 
 
 13
 Beginning on April 13, 1945 the city of Jena was occupied by the Allies. It was first occupied by the Armed Forces of the United States, who remained for two and one-half months, relinquishing control in July, 1945 to the Soviet Military Forces, after it was decided that Thuringia was to be part of the Soviet Zone, pursuant to the Allied statement on Zones of Occupation, issued on June 5, 1945, which divided Germany into four military occupation zones.
 
 
 14
 At the time of Germany's surrender, the Zeiss Foundation deputy was Professor Abraham Esau, and its Board of Management consisted of Professor Walter Bauersfeld, Paul Henrichs, Dr. Heinrich Kueppenbender, and Professor Georg Joos. The Schott Board consisted of Dr. Erich Schott, Richard Hirsch and Mr. Henrichs. The administrative offices and principal manufacturing establishments of both firms were in Jena, but Zeiss also had branch establishments in Berlin, Cologne, Hamburg, Vienna, and a number of foreign countries, all outside what was to become the Soviet Zone, and Schott had a branch factory in Landshut, Bavaria, which was within the American Zone.[9]
 
 
 15
 In mid-June, 1945, when it was evident that Jena was shortly to become a part of the Soviet Zone, American Military authorities evacuated all members of the Boards of Management of the Zeiss and Schott firms and approximately 122 top scientific, production and administrative personnel, to Heidenheim, Wuerttemburg, in the United States Zone of occupation, where they established a factory to assist in the continuing war effort against Japan. The management and scientists did not depart voluntarily but under military orders.
 
 
 16
 The members of the Board of Management of Zeiss designated three Zeiss employees, Dr. Friedrich Schomerus, Viktor Sandmann, and Dr. Hugo Schrade, to act during their absence. The Board of Schott made a similar designation of three of its employees.[10] Appellants contend that the members of the Boards orally resigned. On conflicting testimony the district court found that the departing Boards of Management did not resign, "but arranged with three trusted employees to exercise their functions during the Board's absence on the understanding that upon the Board's return it would assume exercise of its management functions in Jena."[11] (FF 82). JA 839.
 
 
 17
 On June 9, 1945 the United States Armed Forces attempted to set up a provincial government and "purported to appoint" Herman Brill as Prime Minister of Thuringia. Brill in turn appointed Dr. Walter Wolf as Minister of Education (FF 66). There is no evidence, however, that the Armed Forces of the United States had authority to organize a new provincial government (FF 67). Under the agreement of June 5, 1945 Thuringia had already been allotted to the USSR for occupation, and the agreement provided for the exercise of governmental authority by each Commander-in-Chief only "in his own zone of occupation" (FF 68). JA 834-835.
 
 
 18
 On July 1, 1945 the military forces of the United States turned over control of Thuringia (including Jena) to the Soviet Armed Forces, who continued Dr. Wolf as Minister of Education for Jena, which had the effect under the statute of constituting him the Zeiss Special Board. Wolf purported to revoke the appointment of Professor Esau as Foundation Deputy and to name Dr. Arno Barth in his place.
 
 
 19
 Some time after the deportation and when it became apparent that the enforced absence of the Zeiss and Schott Boards of Management from Jena would be longer than expected, a dispute arose over management between the boards in the American Zone and their designees in the Soviet Zone. On conflicting evidence, and after careful analysis of all letters exchanged between the two groups and testimony relating to the intention of the parties, the district court held that the Heidenheim groups remained as the official and legal boards, although they had in the exchange of letters acknowledged that the Jena caretakers were the sole responsible management in Jena.[12]
 
 
 20
 In December, 1945 the Soviet Military authorities sequestered the assets of Zeiss firm as reparations, the plants having supplied equipment for the Nazi military effort. Notice was given to the Zeiss Works, and Schrade was appointed sequestrator. Commencing on October 22, 1946 the Zeiss and Schott plants in Jena were almost totally dismantled and 94% of all plant equipment and more than 300 employees were transported to the Soviet Union. Under Order 124, the trademarks used in connection with the sequestered assets were included in the sequestration (FF 226). JA 899.
 
 
 21
 Thuringia authorized a partial rebuilding of the Jena plants. Between 1945 and 1948 plants for the manufacture of Zeiss products were continued and established in the Western Zones.[13] The Jena group continued to manage Foundation interests in the Soviet Zone and to hold itself out as the Boards of Management. Foundation interests in the Western Zones were managed by the Heidenheim group under power of attorney from the Jena group, even though the Heidenheim group considered itself responsible for those interests as the Board of Management (FF 180). JA 882. Heidenheim and Landshut became in fact new centers of the Foundation, equal in importance to Jena in the administration of the Foundation's interests (FF 235). JA 901.
 
 
 22
 In early 1948 the Expropriation Commission for Thuringia, established by the Soviet authorities, voted to include Zeiss and Schott on a list of business enterprises whose sequestered assets were to be expropriated (FF 237), and on April 17, 1948 the Soviet Military Administration issued Order No. 64 ratifying this action (FF 239). JA 902. In February, 1948 the Soviet Military Administration had created the German Economic Commission to supervise the establishment of a new Socialist economy in the Soviet Zone (FF 240). This Commission issued two decrees providing that trademarks were to be included among sequestered assets which were expropriated, unless expressly excepted (FF 241). JA 902-903.
 
 
 23
 Decrees entered June 1, 1948 by the Government of the Land of Thuringia confirmed the expropriation of the Zeiss and Schott Works, including assets which had been sequestered in accordance with Order No. 124. There was no evidence that any exceptions of trademarks had been made (FF 242-244). JA 903. After the expropriations the Jena managements no longer had any function to perform with respect to the Foundation enterprises Zeiss and Schott (FF 249). JA 904.
 
 
 24
 Since the expropriation and transfer to state ownership, VEB has been the instrumentality through which the East German Government has operated the expropriated Zeiss plant in Jena (FF 264-269). JA 908-909.
 
 
 25
 Neither the nationalization decrees nor the deed or expropriation purported to terminate the existence of the Zeiss Stiftung. In discussing its finding that the Foundation's capacity to function was destroyed, the district court said in part:
 
 
 26
 "Thus the Foundation's capacity to function in the Soviet Zone in accord with the Abbe Statute was completely destroyed by the Soviet expropriation decree, which finally and unequivocally stripped it of its commercial enterprises, which were the source of its existence in Jena, thereby working a basic change in substance, not merely one in form. Beginning in June 1948 and continuing until May 1951 the Zeiss and Schott enterprises in Jena were transferred from the Foundation to the V.V.B. Optik, an association of peoples-owned enterprises engaged in manufacture of precision mechanical and optical instruments. On November 30, 1948 the firm name Carl Zeiss was cancelled in the Commercial Register of the County Court of Jena, and a new entry was made stating that the firm was the `property of the people,' in line with the Soviet authorities' socialization of the East. This was followed by a further entry on November 20, 1949 changing the name of the firm to `Optik Carl Zeiss Jena VEB,' meaning `peoples-owned enterprise.' In May, 1951 the Zeiss and Schott enterprises were separated by the German Democratic Republic from V.V.B. Optik association, and converted into independent V.E.B. entities under the direct supervision of the Ministry of Machine Construction in East Berlin, subject to control by other East German governmental agencies. Appointed by East Germany as the `Works Director' of both VEB enterprises, Schrade was responsible solely to the Ministry for Machine Construction, and not to the Foundation or to any Board of Management, Deputy, or Special Board." JA 1014-1015.
 
 
 27
 The Foundation had industrial and other assets located outside the Soviet Zone of occupation valued at more than thirty million marks, which could not be reached by the expropriation decrees. The district court found that the existence and operation of these commercial assets in the West could not serve to prolong the Foundation's existence in the East since, as far as Soviet authorities were concerned, the assets had been expropriated and no longer belonged to the Foundation but represented state-owned properties.[14]
 
 
 28
 On June 16, 1948 the German Economic Commission adopted a resolution recognizing the "existence and operation of the Carl Zeiss Foundation" and directed that the rights and duties of the "peoples-owned" Zeiss and Schott enterprises should be established in a "new version to be drawn up of the Statute of the Foundation" and providing that until the new version was prepared "the powers of all the governing bodies of the Foundation will be exercised by a Foundation Commissioner to be appointed by the German Economic Commission." No new "version" was ever prepared and approved. Although a Foundation Commissioner was appointed, he never functioned. JA 1020.
 
 
 29
 On July 30, 1948, following the expropriation decrees, the Board at Heidenheim, after conferring with legal counsel, applied to the Minister of Education of Wuerttemberg for a decree creating a new domicile for the Foundation in Heidenheim. On February 23, 1949 Wuerttemberg's Minister of State issued a decree amending the Foundation's statute to create a new domicile in Heidenheim,[15] and providing that the affairs of the Foundation should be administered by Messrs. Bauersfeld, Kueppenbender and Henrichs of the Zeiss Board pursuant to section 114 of the Statute.[16] The district court found that "The Wuerttemberg decree of February 23, 1949 gave legal recognition to the Zeiss Board's identity as the official Board and to its de facto control and administration of the Foundation's assets in the West."[17] JA 1030.
 
 
 30
 In May, 1951 East Germany's Minister of Machine Construction directed the President of Thuringia to appoint a new "Foundation" Deputy and new "organs" of "Carl Zeiss Stiftung," pointing out the urgency occasioned by threatened litigation by the West. On June 27, 1951 the Minister of Education wrote a letter to five persons advising them that they were appointed "as organs of the Carl Zeiss Foundation for the management of industrial activities * * *, such appointment to take effect June 27, 1945." JA 1033-1034. There was testimony from legal experts, however, that as far as East Germany was concerned the Foundation had ceased to exist after expropriation of its commercial enterprises there.[18] In July, 1951 the practice of holding Foundation meetings, which had been discontinued in June, 1948, was resumed.
 
 
 31
 Although appellants argue that even though the Zeiss and Schott Works were nationalized, the Stiftung in Jena has remained alive, we agree with the district court "that the so-called `Foundation' which the East German government sought to `revive' or `warm up' in 1951 is not the Foundation established by Dr. Abbe and is not identifiable with, or a successor to, that Foundation."[19] JA 1035.
 
 
 32
 Appellee Zeiss Ikon A.G. was organized in 1926 and registered in the Commercial Register of the County Court in Dresden, Saxony, Germany, and has been engaged in the manufacture and sale of photographic equipment and related goods, using the trademark "Zeiss Ikon." In June, 1947 the Ministry for Economics and Economic Planning of the Government of the Land of Saxony, located within the Soviet Zone, expropriated the enterprise Zeiss Ikon A.G. of Dresden without compensation, effective July 1, 1946. The "Zeiss Ikon" trademarks were included in the expropriation (FF 330-336). JA 926-927.
 
 
 33
 On March 3, 1948 at a special meeting of stockholders in Stuttgart, in the American Zone, a resolution was adopted transferring the domicile of Zeiss Ikon A.G. from Dresden to Stuttgart. The bylaws then in effect provided that meetings of stockholders could be held in Dresden, Berlin, Stuttgart, or Jena. In a judgment rendered February 14, 1958 the Federal Supreme Court of West Germany upheld the validity of the transfer of domicile from Dresden to Stuttgart. The district court found that the transfer of domicile of Zeiss Ikon A.G. was legal under German law and that appellee Zeiss Ikon A.G. is identical with the corporation of that name organized in 1926 and domiciled in Dresden until its expropriation in 1947. (FF 338-343). JA 927-928.
 
 
 34
 At a meeting in October, 1949 at which Bauersfeld, Kueppenbender, Henrichs, Hirsch, Schott, David and Sandmann were present, "the Heidenheim management made it clear that in their view only they and not the expropriated works in the East were entitled to the Zeiss name and marks and that they were not willing to give up the good will of the firms symbolized by the trade names and trademarks. They offered, however, to permit the VEB in Jena to use the marks on the basis of a license agreement." (FF 346-347). JA 928-929.
 
 
 35
 On February 17, 1950 Messrs. Bauersfeld and Kueppenbender (signing for the Zeiss firm) and Messrs. Henrichs, Hirsch and Schott (signing for the Schott firm) addressed a letter to VVB Optik (the Association of State owned enterprises of which VEB Carl Zeiss Jena then formed a part), claiming ownership on behalf of the Foundation of the firm names and trademarks and proposing discussions looking toward a license agreement pursuant to which the state-owned Zeiss enterprise at Jena would be permitted to use the trademarks in the West. (FF 348-350). JA 929.
 
 
 36
 By letter dated December 3, 1951 members of the Zeiss Board in Heidenheim renewed the proposal to license the Zeiss VEB, which the district court found was "tacitly accepted by East Germany's Minister of Machinery Construction, who on February 25, 1952, instructed Dr. Schrade that the East German government deemed it expedient to adhere to the proposal as a `modus vivendi' and to proceed accordingly." JA 1037. The court found that until sometime in 1953, with minor exceptions, products of the VEB were sold in Heidenheim's letter of December 3, outside the Communist Bloc countries in accordance with the conditions laid down 1951 (FF 380). JA 937.
 
 
 37
 After the East and West failed to reach an agreement on licensing terms, the Zeiss firm in Heidenheim on February 12, 1954 advised the East that it intended to take legal steps to protect its rights in the Zeiss name and marks (FF 384), and on February 18, 1954 advised all foreign distributors to cease handling Zeiss products made in the East (FF 385). JA 938. On February 27, 1954 the Zeiss firm in Heidenheim obtained an injunction in the district court in Goettingen restraining a West German distributor from selling VEB made products bearing Zeiss marks in West Germany (FF 387). JA 939.
 
 
 38
 In April, 1954 the Council of the District of Gera (a political subdivision of East Germany) brought an action in the district court of Stuttgart, West Germany, against the Zeiss firm in Heidenheim and the members of the Board, seeking to have the entry of the Zeiss firm stricken from the Commercial Register in the County Court of Heidenheim, and to have certain trademarks, including those at issue here, transferred to and reregistered in the name of the Carl Zeiss Stiftung of Jena. On July 31, 1954 the action was dismissed on the ground that the plaintiff was not a legal representative of the Carl Zeiss Foundation and had no authority to bring the action. Ultimately this decision was affirmed by the Federal Supreme Court of Germany on November 15, 1960.
 
 
 39
 In May, 1954 the Zeiss firm in Heidenheim brought an action in the District Court of Duesseldorf against Zeiss VEB (appellant in this action) and DIA[20] seeking an injunction against the use of the Zeiss trade names and marks. This resulted in judgment for the plaintiff, ultimately affirmed by the Federal Supreme Court on July 24, 1957 in a decision holding that the board members in Heidenheim had never resigned and were authorized to represent the Foundation as the proprietor of the Zeiss firm (FF 399-402). JA 942-943.
 
 
 40
 In April, 1954 the Supreme Court of East Germany rendered an advisory opinion to the effect that the Foundation continued to exist in Jena, that the members of the Zeiss and Schott boards had resigned in 1945, and that the 1949 Wuerttemberg decree establishing a new domicile was annulled. A default judgment was entered in the District Court of Leipsig, East Germany, in favor of the District of Gera and the Zeiss VEB against the Zeiss firm in Heidenheim, which was affirmed by East Germany's Supreme Court in March, 1961. There was no participation by the plaintiffs or any representatives of the Foundation or Board in the West in any of the East German proceedings.
 
 
 41
 Since February, 1954 there has also been litigation with respect to the Zeiss marks in various other countries throughout the world (FF 404). JA 943.
 
 
 42
 The firm of Carl Zeiss first registered the trademark "Zeiss" in the United States in 1912 (FF 421), "Carl Zeiss Jena" in the distinctive lens frame in 1907 (FF 422), the distinctive lens frame alone in 1914 (FF 423), "CZ" in 1913 (FF 424). In 1919 the United States purported to vest title in the Alien Property Custodian (FF 425). Despite this vesting the Carl Zeiss firm continued to use the trademark in United States commerce at least until 1941 (FF 426). JA 946-947.
 
 
 43
 Zeiss Ikon A.G. first registered the trademark "Zeiss Ikon" in the United States in 1929. In 1950 the United States purported to vest title in the Attorney General (FF 427). JA 947-948.
 
 
 44
 Carl Zeiss, Inc., was organized as a New York corporation in 1925 or 1926. Thereafter until the end of 1941 goods manufactured by the Zeiss firm and Zeiss Ikon A.G. were primarily sold in the United States through Carl Zeiss, Inc. On August 28, 1942 the United States Government vested the capital stock of Carl Zeiss, Inc., in the Alien Property Custodian. It remained so vested until its sale on December 30, 1960 (FF 429-430). JA 948.
 
 
 45
 After the expropriation in 1948 the Zeiss firm in Heidenheim did not resume manufacturing optical instruments until 1953. From 1949 until September, 1953 optical instruments produced by Zeiss Opton at Oberkochen and elsewhere were sold in the United States by Carl Zeiss, Inc. (FF 433). Since 1953, when it resumed production in West Germany, the Zeiss firm in Heidenheim has sold in the United States goods bearing the various Zeiss trademarks (FF 435). JA 949.
 
 
 46
 In 1949 appellant VEB commenced to sell goods bearing the Zeiss trademarks in the United States through Carl Zeiss, Inc. In 1950 it commenced to sell through appellants Ercona and Steelmasters (FF 436). JA 949. Since 1961 VEB has sold products in the United States principally through Ercona, and has also sold some products to other dealers (FF 439-441). JA 950-951.
 
 
 47
 Goods made by appellees in West Germany and those made in Jena bearing Zeiss trademarks have generally conformed to the standards for Zeiss products (FF 442). JA 951.
 
 
 48
 Prior to 1960 the Attorney General of the United States claimed to be the owner of the trademarks in the United States in his capacity as custodian of alien property. On April 4, 1956 an action was commenced by Ercona and Steelmasters against the Attorney General, Secretary of the Treasury, and Commissioner of Customs seeking to enjoin the United States from preventing the importation of goods manufactured by appellant VEB and bearing the trademark Zeiss on the ground that the mark had not been validly vested in the United States in 1919 because there was no business to which the mark was appurtenant. Judgment was entered in favor of Ercona and Steelmasters by the district court and affirmed on appeal. Rogers v. Ercona Camera Corporation, 107 U.S.App.D.C. 295, 277 F.2d 94 (1960).
 
 
 49
 The district court in that case expressly stated that "the respective rights, if any, in the `Zeiss' trademark of the several Carl Zeiss firms now located in East Germany and in West Germany are not in issue in this case, and the Court expresses no opinion with respect thereto. Nor are the decisions rendered by foreign courts with respect to such rights relevant here." 120 U.S.P.Q. 100, 105 (D.C. 1958). In affirming the Court of Appeals also noted that the respective claims of Heidenheim and Jena were not in issue. 277 F.2d at 97.
 
 
 50
 On December 30, 1960 the United States sold the stock of Carl Zeiss, Inc. to the plaintiff Carl Zeiss Stiftung. In authorizing the sale, the Attorney General, acting on behalf of the President of the United States, stated the view of the United States Government that, consistent with the foreign policy interests of the United States and in order that the American consumer not be confused or misled, only Carl Zeiss Foundation in West Germany should be recognized as the legitimate Carl Zeiss Foundation and its operating firms as the producer of genuine Zeiss products (FF 453). JA 953-954.
 
 
 51
 The district court found that confusion and mistake has resulted among members of the consuming public in the United States from the sale of competing products by plaintiffs and defendants bearing substantially identical trademarks (FF 479) and that continued sale by the defendants will probably result in continued confusion, mistake and deception (FF 481). JA 959-960.
 
 
 52
 Between October 1, 1953 and September 30, 1966, sales of products of the Zeiss firm of Heidenheim bearing the various Zeiss trademarks in the United States totaled $56,803,069.00, and Carl Zeiss, Inc., expended $5,893,498.00 in advertising and promoting the trade names and products (FF 468). JA 957.
 
 
 53
 The total volume of goods produced by appellant VEB and sold by Ercona in the United States between 1948 and 1966 amounted to $6,709,491.00 or an average of less than $350,000.00 a year, with an annual volume since 1957 less than $300,000.00 (FF 473). JA 958. The annual volume of appellant VEB's sales ex-factory to Steelmasters and Ercona has exceeded $150,000.00 in only one year and has been less than $100,000.00 in seven of the remaining years (FF 474). JA 958.
 
 
 Which Foundation Is Legal Successor to Original Abbe Foundation?
 
 
 54
 As the district court stated in its reported decision (293 F.Supp. at 896), a central and primary issue is whether the appellee Foundation or that established in East Germany in 1951 is legally identical with, and the successor to, the original Abbe Foundation. In contending that the Jena Foundation is identical with the original Abbe Foundation, appellants argue that the district court erred in (a) failing to determine this issue in accordance with the law prevailing in Jena; (b) finding that the nationalization of the Jena works terminated the capacity of the Foundation to function; (c) applying rules of "German law" which are contrary to the law in Jena; and (d) finding that the domicile could be moved from Jena and that the charter of the Carl Zeiss Foundation was amended to move the domicile to Heidenheim.
 
 
 55
 Calling attention to the fact that the Soviet expropriation purported to encompass all Zeiss trademarks owned by the Zeiss firm and the well-settled United States policy against extraterritorial recognition of such decrees,[21] the district court concluded that (1) "the Foundation or its legal successor, if it has legally continued to exist (whether in East Germany, West Germany, or elsewhere), must be recognized as the owner of the United States marks"; and (2) "while a United States court may give effect to expropriation of property located within the territory of the expropriating state, * * * United States trademarks, for the purpose of determining the applicability of our anti-expropriation policy, are deemed to be located within the United States, even though the trademark goods may be manufactured elsewhere, * * *."[22] p. 896. It therefore became the task of the district court "to identify the surviving owner" as between the conflicting claims.
 
 
 56
 In our opinion there is substantial credible evidence to support all of the findings of fact set forth above. Accordingly we agree with the district court that if the issue of legal identity or successorship may be resolved solely as a question of fact, the facts dictate a decision in favor of appellee "as the true Zeiss Foundation"; and if fundamental fairness and equity are the criteria, "the de facto existence and operation of the (appellee) Foundation in the West as a good faith effort to continue what remained of the overall Abbe Foundation enterprise, after expropriation of its assets in the East and its inability to function in its original domicile, would call for its recognition." p. 897. The authorities cited by the district court support these conclusions.
 
 
 Law of West Germany Properly Applied
 
 
 57
 The parties agree that the issue of identity must be determined by German law. They disagree as to whether the German law is that promulgated and interpreted by West Germany or by East Germany.
 
 
 58
 It is true, as Judge Mansfield stated, that the "legal existence, status, identity, and domicile of a foreign corporate entity or juristic personality, such as the Foundation here, must be determined by the laws of the country where it has been created and continues to exist." p. 898. Here we have a unique situation by reason of the partition of Germany after the creation of the Foundation pursuant to German law and the subsequent expropriation in East Germany. The original Foundation owned the commercial enterprises. This was permissible under German law. Those enterprises in East Germany are now held by VEB, a state or people-owned entity. The present Foundation in East Germany claiming ownership of the Zeiss name and marks does not claim ownership of the commercial enterprises and is dependent upon the state-owned enterprise for its support.
 
 
 59
 The district court properly held that whether German law as declared or construed by the courts of unrecognized East Germany or recognized West Germany[23] should be applied depends to some extent on the nature of the question to be resolved; that normally "the acts of an unrecognized regime which pertain to its purely local, private, and domestic affairs will be given effect"; but that here the court is "dealing with decisions of East German courts with respect to matters extending beyond the borders of East Germany, such as the nature of a foundation under federal law and the effect to be given to acts of Wuerttemberg." pp. 900-901.
 
 
 60
 We conclude that the district court properly applied the law of West Germany. As stated in its opinion, effective January 1, 1900 the German Empire adopted a federal Civil Code, applicable throughout the German federation, containing provisions relating to foundations which were expressly made applicable to existing foundations created under the laws of member states. The Zeiss Foundation Statute was amended in 1905 pursuant to the new German Civil Code. After the adoption of the Civil Code, a foundation was a creature of federal law even though the administration of federal law was delegated to the individual member states and the foundation had its domicile in a particular state. p. 902.
 
 
 61
 The district court recognized that the domicile of a foundation would usually be the state where its statute was accepted or approved and that a prohibition against transfer of domicile, such as found in Section 121 of the Zeiss Foundation Statute (see note 5, supra) would ordinarily bar a transfer. Section 87 of the German Civil Code, however, provides that where a Foundation's purposes can no longer be fulfilled, its statutory purpose may be amended by "the appropriate authority" to enable it to function in accordance with the founder's intention as far as possible.
 
 
 62
 The appellees' German law experts (whom Judge Mansfield found more credible) would give effect to the German Civil Code and were of the opinion that its provisions superseded the private law systems of the states to the extent that the field was occupied by the federal government. The district court accordingly accepted their view "that under the circumstances presented here (Soviet expropriation which made it impossible to fulfill Dr. Abbe's stated purpose of maintaining the Zeiss Foundation's commercial enterprises and domicile in Jena, and left its operational center and principal remaining commercial works in Wuerttemberg), the State of Wuerttemberg, as a member of the German federation, was empowered by § 87 as `the appropriate authority' to establish the Foundation's domicile where its administrative center and principal operations were now located."[24] pp. 903-904.
 
 
 63
 As noted supra, the Federal Supreme Court of West Germany on July 24, 1957 granted injunctive relief in favor of the Carl Zeiss firm of Heidenheim against the VEB Carl Zeiss of Jena and the DIA. This decision "was based on the conclusion that expropriation of the Foundation's assets had shifted the `economic center of gravity of the enterprise' to the West, with the result that the firm's principal place of business became Heidenheim, and the Zeiss Board in Heidenheim * * * was still the official Board, with authority under Section 114 of the Statute to act on behalf of the Foundation with respect to the Zeiss trademark and trade-name in West Germany, regardless whether its legal domicile had been validly transferred from Jena to Heidenheim." p. 908.
 
 
 64
 The district court of course found independently that the members of the Heidenheim Boards had not resigned and that the effect of the expropriation was to leave Heidenheim as the Foundation's center or principal place of business. Accordingly it is unnecessary to determine whether this and other decisions of the West German courts had estopped appellants from questioning the fact that the Foundation enterprise known as the firm Carl Zeiss was a continuation of that which had existed in Jena. We agree with the district court that in any event these decisions did not have the effect of precluding appellants from raising legal issues not considered by the West German courts, such as the existence of the Foundation as a federal entity and the authority of Wuerttemberg to act under § 87 of the German Civil Code. In our opinion the district court reached the correct conclusion on these issues on the basis of the testimony of German law experts.
 
 
 65
 The district court found the opinions of the courts of East Germany of limited assistance, calling attention to the fact no member of the Boards or other authorized official of the Foundation ever received advance notice of the advisory opinion rendered on April 6, 1954 by the Supreme Court of East Germany, and no Board member or authorized representative participated in the proceeding which resulted in the default judgment in September, 1959,[25] affirmed by the Supreme Court of East Germany, in March, 1961. As a result, the "East German courts did not have before them much of the essential proof relied upon" by the district court with respect to the crucial issues in this case. Judge Mansfield found also a lack of "reasoned objective approach" on the part of the East German courts and that their decisions were "thoroughly saturated with a combination of communist propaganda, diatribes against the `capitalist oriented' decisions of the West German courts, and absence of judicial restraint," quoting an extended excerpt from the Supreme Court's opinion of March 23, 1961 to illustrate the nature of the Court's approach. p. 907.
 
 
 Foreign Decisions
 
 
 66
 It is true, as appellants contend, that courts in England, Switzerland, Pakistan, Norway, India, and Australia[26] have accepted East German law, at least for the purpose of determining the capacity of the Jena Foundation to institute suit. As noted supra, the courts of East Germany have held that the Jena Foundation was identical with the Zeiss Stiftung.
 
 
 67
 In particular, appellants rely upon the opinion of Mr. Justice Cross in the High Court of Justice — Chancery Division in Carl Zeiss Stiftung v. Rayner & Keeler, Ltd. (1964) and opinions in the House of Lords affirming the lower court (1966). In further proceedings in the same case Mr. Justice Buckley in an opinion rendered in 1969[27] clarifies the nature and sharply limits the effect of the prior holdings in that case, as well as the decisions of India and Pakistan.
 
 
 68
 In the English action Carl Zeiss Stiftung in Jena is one of the plaintiffs and Carl Zeiss Stiftung of Heidenheim is one of the defendants. The matter was before Mr. Justice Cross on a "summons issued by the defendants" seeking dismissal and a stay of further proceedings on the ground that the plaintiff did not have authority to represent the Carl Zeiss Stiftung. The summons to stay was dismissed. Before Mr. Justice Buckley was a motion of the plaintiff, the Carl Zeiss Stiftung of Jena, to strike parts of the defense of the defendant Carl Zeiss of Heidenheim. The court granted the motion to strike the defense denying that the plaintiff was a validly constituted Stiftung and that the administration of the plaintiff had been transferred to the Council of Gera. The court denied the motion to strike the defenses alleging that the defendant and not the plaintiff was the original Stiftung; that the "Sitz" was transferred to Heidenheim; and, that the original Stiftung ceased to exist as a result of the confiscatory decrees and transfer of the optical and glass works. It is clear from this opinion that the English courts have not yet determined most of the critical issues here involved.
 
 
 69
 After holding that the decision of Justice Cross was final and binding on the parties and their privies with respect to the finding that the plaintiff was a "body competent through the council of Gera to instruct solicitors and to sue as a plaintiff * * *," Mr. Justice Buckley continued:
 
 
 70
 "The learned judge's order, read in the light of the application on which it was made, does not appear to me to carry any further necessary implication. * * *[28]
 
 
 71
 "I am consequently of opinion that nothing decided by Cross, J., or the House of Lords renders any question about the status or character of the third defendant res judicata on three grounds: (i) that any such question must be answered by reference to West German law, which was not investigated either by Cross, J., or the House of Lords; (ii) that any decision on such a question would not have been necessary for the purposes of those proceedings but purely collateral; and (iii) that the plaintiff was not a party to those proceedings nor privy to any party to those proceedings."
 
 
 72
 After discussing the judgments in Pakistan and India, Justice Buckley concludes that "neither the Pakistani judgment nor the Indian contains any decision which debars the third defendant (appellee here) from alleging that it is by West German law, or indeed any other system of law except East German law, the original stiftung."
 
 
 73
 Finally, Justice Buckley concludes that the law of the original domicile or "sitz" is not necessarily controlling and that it must be "at least theoretically possible that by operation of the proper law for the time being of a corporation another system of law may be substituted as the proper law of the corporation." He continued:
 
 
 74
 "If, however, this be the intention, the point must involve consideration of what at any relevant moment or moments should be regarded as the proper law of the original stiftung or of the third defendant. Clearly in the first instance the proper law of the original stiftung was the law of the Grand Duchy of Saxe-Weimar-Eisenach; but, having regard to the political vicissitudes of Thuringia and to the possible conflict between East and West German law, this aspect of the case, which was not relevant to what Cross, J., and the House of Lords had to decide, has, in my judgment, not yet been judicially considered, either expressly or by implication, in any litigation relied on in these proceedings, and cannot be res judicata. If, however, the plea means something else (for instance that the administrative centre or principal place of business was transferred) this must involve questions of foreign law which, so far as I can tell, have not yet been judicially considered and so cannot be res judicata."
 
 
 75
 Appellants in their brief quoted at length from the opinion of Justice Cross finding that in the letter of January 28, 1946 (referred to by Judge Mansfield as the "blackmail letter") the Heidenheim gentlemen "did unquestionably agree that they had vacated office." He rejected the testimony of Dr. David that David had explained the intent of the letter orally at a meeting in Jena at which Dr. Schrade was present, accepting instead Schrade's testimony denying that he (Schrade) was present at any meeting.
 
 
 76
 The Jena Foundation had contended before Justice Buckley that in making the finding that the Heidenheim group had resigned, Justice Cross intended "to decide this issue once and for all." Justice Buckley, however, concluded that it was a "matter for the trial judge to decide whether he will admit any further evidence on this issue," suggesting that the trial judge "might be persuaded that Cross, J. did not have all the relevant material before him" or might otherwise conclude that the finding had no effect on the action.
 
 
 77
 Judge Mansfield found that "Dr. Schrade's earlier denials under oath" that David delivered and personally explained the letter "(upon which the High Court of London rested so heavily in its decision) are now thoroughly disproved, particularly by Dr. Klemm's diary (uncovered only recently)." Without accepting Dr. David's testimony in toto, Judge Mansfield found it generally credible and corroborated. JA 989-990. We accept the findings of Judge Mansfield.[29]
 
 
 "Act of State" Doctrine
 
 
 78
 The district court made a careful and detailed analysis of the "act of state" doctrine, reaffirmed by the Supreme Court in Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). 293 F.Supp. pp. 909-914. We adopt that portion of Judge Mansfield's opinion and agree with his conclusion that "although the Wuerttemberg decrees and the German Parliament's Act of 1967 are not entitled to recognition as acts of state to the extent that they purport to terminate the Foundation's domicile in East Germany since to that extent they acted extraterritorially, they are entitled to such recognition insofar as they acted to give a legal status to the Foundation's de facto existence in West Germany as a continuation in the West of the original Zeiss cooperative enterprise, whose remaining commercial assets (worth 30 million marks) and personnel were almost entirely within the West's territorial jurisdiction." p. 912.
 
 
 Appellee Zeiss Ikon A.G.
 
 
 79
 We agree with the district court that appellee "Zeiss Ikon A.G. is the same corporation as that which, prior to the Soviet expropriation of its assets in 1947, had its seat in Dresden (Soviet Zone), with manufacturing establishments in Stuttgart and West Berlin"; that its domicile was "validly transferred" to Stuttgart; and that it is the "owner of the United States `Zeiss Ikon' marks." p. 915.
 
 
 Trading With The Enemy Act
 
 
 80
 We adopt also that portion of Judge Mansfield's opinion holding that appellants are "barred from asserting any claims to the United States trademarks in dispute by § 5(b) of the Trading With The Enemy Act (50 U.S.C. App. § 1 et seq.) and regulations thereunder (8 C.F.R. § 507.46)." p. 916.
 
 
 Claim for Joint or Concurrent Use and Defenses of Laches, Acquiescence and Abandonment
 
 
 81
 In oral argument counsel for appellants relied primarily upon their alternative claim that in any event appellee Foundation is not entitled to an injunction, and appellee VEB should be accorded "joint" or "concurrent" use of the names and trademarks by reason of laches, acquiescence or abandonment on the part of the appellee.
 
 
 82
 The district court correctly summarized the applicable law with respect to these defenses:
 
 
 83
 "Where a person entitled to exclusive use of a trademark is guilty of unreasonable delay in asserting his rights against an infringer or junior user, or acquiesces in the latter's use, or evinces an intent to abandon his rights in the marks, a court of equity has the discretionary power, after weighing the respective interests of the parties, to deny injunctive relief or an accounting. Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60 (1900); La Republique Francaise v. Saratoga Vichy Spring Co., 191 U.S. 427, 24 S.Ct. 145, 48 L.Ed. 247 (1903)." p. 917.
 
 
 84
 The court then pointed out that the existence of laches or acquiescence, and whether it is sufficient to bar relief, "depends upon a consideration of the circumstances of each particular case and a balancing of the interests and equities of the parties." The court continued:
 
 
 85
 "Among the factors to be weighed in determining whether laches will bar relief are the strength and value of the trademark right asserted * * * the plaintiff's diligence, or lack of it, in seeking to enforce the mark * * * the harm that will result to the senior user if relief is denied * * * whether the junior user is an innocent infringer who acted in good faith ignorance of the senior's rights * * * the extent to which the senior and junior uses of the mark are competitive * * * and the extent of harm or prejudice suffered by the junior user as a result of the senior's delay * * *." p. 917.
 
 
 86
 The court also distinguished laches from acquiescence:
 
 
 87
 "As distinguished from laches, acquiescence constitutes a ground for denial of relief only upon a finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that the plaintiff would not assert his trademark rights against the defendant. Aunt Jemima Mills Co. v. Rigney & Co., 247 F. 407 (2d Cir.), cert. denied, 245 U.S. 672, 38 S.Ct. 222, 62 L.Ed. 540 (1917); Alfred Dunhill of London, Inc. v. Dunhill Tailored Clothes, 119 U.S.P.Q. 325 (S.D.N.Y.1958). Although acquiescence may bar relief even where the plaintiff acts diligently, whether conduct amounts to acquiescence warranting denial of relief turns on an examination of all the surrounding circumstances, and requires a balancing of the equities." p. 917.
 
 
 (a) Laches
 
 
 88
 Appellants argue that appellees were guilty of laches in their "fourteen-year delay in bringing this action." It is clear that "mere passage of time cannot constitute laches." A district court in its discretion, however, may find laches if the passing of time can be shown to have lulled the defendant into a false sense of security, and the defendant acts in reliance thereon. Friend v. H. A. Friend and Company, 416 F.2d 526, 533 (9th Cir. 1969).
 
 
 89
 In this case the district court found that appellees' failure to institute suit until 1962 "was justified by circumstances revealing that they were neither sleeping on their rights nor leading defendants to believe that no action would be taken, but that, on the contrary, they were for almost the entire period from 1949 to 1962 vigorously asserting and prosecuting their rights."[30] 293 F.Supp. p. 918. We agree. There is no evidence that appellants were ever lulled into a false sense of security or acted in reliance thereon.
 
 
 (b) Acquiescence or Abandonment
 
 
 90
 It is true that between 1948 and 1954 Jena manufactured products were sold in the West with the approval of the Heidenheim management. They were sold through Heidenheim sales outlets and were products which did not compete with or were in short supply at Heidenheim.[31] Moreover, it is clear that at all times during that period appellee Foundation claimed the trademarks outside the Soviet Zone (which Jena disputed). During most of the period the Boards in Heidenheim were negotiating with VEB on a licensing arrangement. While there was no formal acceptance of the licensing proposal, the district court properly found that the Jena VEB adhered to the program as a "modus vivendi" until February, 1954. There was no showing of any intent on the part of appellee Foundation to abandon its rights in the marks.[32] Under these circumstances the conduct of appellee Foundation cannot be said to constitute either acquiescence or abandonment warranting denial of relief.
 
 
 (c) Joint or Concurrent Use
 
 
 91
 Our conclusion with respect to the defenses of laches, acquiescence and abandonment answers in part appellants' contentions that the injunction was unwarranted and that appellants are entitled to the "joint use" or "concurrent use" of the Zeiss trademarks. As the district court well said, these terms standing alone do not represent a defense to trademark infringement claims. They simply describe factors considered in determining the equities in a particular case. p. 918.
 
 
 92
 This court in a number of trademark infringement cases has considered the "conflicting interests" which must be weighed and balanced in determining whether both parties should be permitted to use trademarks in dispute.[33] In no case, however, have we considered the precise situation here presented — where both parties claim ownership or the right to use the same names and substantially the same marks and are directly competitive in the manufacture and sale of the same products. Most cases have involved names and marks which are similar or the use of family names, and the court has been concerned with whether the use of a "reproduction, * * * copy, or colorable imitation of a registered mark * * * is likely to cause confusion, or to cause mistake, or to deceive" (15 U.S.C. § 1114(1) (a)). Obviously also those cases where the parties' goods were not competing or the defendant adopted his mark in ignorance of the plaintiff's mark are not in point.[34]
 
 
 93
 Under the Lanham Act (15 U. S.C. § 1114(1)) confusion as to source of origin is the "keystone" for injunctive relief. Avon Shoe Company v. David Crystal, Inc., supra, 279 F.2d at 612. In determining whether there is sufficient evidence of confusion and deceit to entitle an owner to injunctive relief, several factors must be considered. This rule was last summarized by this court in Miss Universe, Inc. v. Patricelli, supra, as follows:
 
 
 94
 "Several factors enter the calculation of `likelihood of confusion': the degree of similarity between the marks in appearance and suggestion; the similarity of the products for which the name is used; the area and manner of concurrent use; the degree of care likely to be exercised by consumers; the strength of the complainant's mark; actual confusion; and an intent on the part of the alleged infringer to palm off his products as those of another." 408 F.2d at 509.[35]
 
 
 95
 As noted supra, the district court found that: "Confusion and mistake has resulted among members of the consuming public in the United States from the sale of competing products by plaintiffs and defendants bearing substantially identical trademarks" (FF 479); and the continued sale by appellants of goods bearing the various "Zeiss" trademarks "and the use of the trade name `VEB Carl Zeiss Jena' or any other trade name containing the word `Zeiss' or `Carl Zeiss' in connection therewith, will probably result in continued confusion, mistake and deception on the part of members of the public and the trade in the United States (FF 481)." JA 959-960. There is ample evidence in the record to support these findings. The factual findings of a trial court should not be set aside unless they are clearly erroneous. Rule 52(a) F.R.Civ.P.[36]
 
 
 96
 In Miss Universe, Inc. v. Patricelli, supra, we held that "while appellant's use of any mark containing the contiguous words or abbreviations `Miss United States of America', `Miss United States', and `Miss U.S.A.' is likely to confuse the consuming public, the same cannot be said about the mark `Miss World — U.S.A.' which contains a different, distinguishable major element in placing the emphasis on `Miss World'". 408 F.2d at 511. The instant case is clearly distinguishable. Here the key words are "Zeiss" and "Carl Zeiss." These names represent trademarks which identify optical and other precision instruments. Confusion is not avoided by adding the words "VEB" and "Jena," or by indicating that the products are manufactured in East Germany. There is of course nothing in the decree to prevent appellants from using the word "Jena" or identifying its goods as having been produced in Jena. Apparently during the period 1956-1959 Ercona did in fact sell Jena made products in the United States without the Zeiss name or marks.[37]
 
 
 97
 After weighing all pertinent factors we agree with the district court that a decree permitting joint or concurrent use is not warranted and would result in confusion and deception of the consuming public.
 
 
 Antitrust Defense
 
 
 98
 There was sufficient evidence to support the findings of the district court on the issues raised by appellants' defense that appellees misused the Zeiss trademarks in violation of the antitrust law. The district court properly rejected this defense for the reasons set forth in its opinion reported at 298 F.Supp. 1309 (1969).
 
 
 Right to Damages
 
 
 99
 Under the Lanham Act when trademark infringement is established the plaintiff is entitled to injunctive relief (15 U.S.C. § 1116) and "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) costs of the action" (§ 1117).
 
 
 100
 This does not mean that a successful plaintiff is entitled in all cases to a monetary award in addition to injunctive relief. The award for damages is "subject to the principles of equity." Relief is properly denied "where an injunction will satisfy the equities of the case" and where "there has been no showing of fraud or palming off." Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 131, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947).
 
 
 101
 Ordinarily it is necessary to show "not only that the infringer infringed, but that he did so with the deliberate intent to cause confusion, mistake or to deceive purchasers; in other words, to purposely palm off the infringer's goods as those of the infringed." Everest & Jennings, Inc. v. E & J Manufacturing Co., 263 F.2d 254, 262 (9th Cir. 1958), cert. denied 360 U.S. 902, 79 S.Ct. 1284, 3 L. Ed.2d 1254 (1959). It has been held also that a plaintiff is not entitled to a monetary award when the defendant apparently acted in a good faith belief in his right to use the mark. Consumers Petroleum Co. v. Consumers Co., 169 F.2d 153 (7th Cir. 1948), cert. denied 335 U.S. 902, 69 S.Ct. 406, 93 L.Ed. 437 (1949).
 
 
 102
 In the decree entered April 1, 1969, it is recited that since in or about 1953, appellants "have, in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), from time to time falsely described and falsely designated the origin of goods imported by them into the United States and sold in United States commerce as being goods produced by plaintiff Carl Zeiss or its licensee when in fact such goods were produced by defendant VEB Carl Zeiss Jena, a nationalized East German concern, which has no legal or other connections with plaintiff Carl Zeiss or any of its affiliated firms." The decree then provided that each plaintiff is entitled to enforce all of its rights against the defendants, "including damages, defendants' profits and an injunction." JA 1218. The determination of the claims for damages and an accounting were deferred for subsequent trial. JA 1221.
 
 
 103
 Appellees argue that the district court found that the appellants were not acting in good faith, relying upon the court's conclusion that appellants having "at all times been on full notice" of appellees' claims were "hardly in the position of innocent or ignorant infringers." JA 1107. We do not construe this as an express finding of bad faith. Nor do we find any "showing of fraud or palming off."
 
 
 104
 Again we are confronted with a unique situation, with no prior cases precisely in point. The district court has found, and we agree, that appellee Foundation is the successor of the Carl Zeiss Stiftung and is the owner of the trademarks. We agree also that appellants were on full notice of appellees' claims. On the other hand, appellants were at all times denying appellees' claims and asserting their own claim to the exclusive use of the trademarks as licensees of the Jena Foundation.
 
 
 105
 Appellants did not seek to have the American public believe that their goods originated in Heidenheim. Nor were they claiming to be licensees of the Heidenheim Foundation. Rather they claimed that as licensees of the Jena Foundation (which they contended was the successor of the Carl Zeiss Stiftung) they were entitled to the exclusive use of the trademarks in the sale of goods manufactured in Jena.
 
 
 106
 The determination of ownership and right to use of the trade names and marks has involved the resolution of many complex and difficult factual and legal issues. The Supreme Court of East Germany expressly held that appellant VEB was entitled to the use of the trademarks, and decisions from other courts have lent some support to appellants' claim. There was a difference of opinion on the part of German legal experts with respect to the applicable German law. Prior to the trial of this case there were many unresolved factors upon which appellants might reasonably rely in support of their claims.
 
 
 107
 Even though in this case the factual and legal issues have now been resolved against appellants, we cannot find under all the circumstances that they acted in bad faith in asserting their claim. We conclude that the "injunction will satisfy the equities of the case" and that the claim for damages should be disallowed.
 
 
 108
 Accordingly the decree of the district court is modified by deleting from it those provisions of paragraphs 6 and 14 which relate to damages and accounting of defendants' profits. As so modified, the judgment of the district court is affirmed.
 
 
 
 Notes:
 
 
 *
 Senior District Judge of the District of Montana, sitting by designation
 
 
 [1]
 VEB, or Volkseigener Betrieb, means "Peoples-Owned Enterprise."
 
 
 [2]
 Exakta Camera Company, Inc. and Camera Speciality Co., Inc., named as defendants, did not participate in the proceeding in the district court and are not parties on this appeal
 
 
 [3]
 Following a six week trial on the issues relating to the ownership and use of the trademarks, the court made 481 findings of fact and filed an opinion on November 7, 1968. That portion of the opinion relating to the applicable law is reported in D.C., 293 F.Supp. 892, with the notation that, "At the court's request the factual background, because of its length, is not published." The court made 27 additional findings of fact on the issues raised by appellants' antitrust counterclaim and filed an opinion on March 12, 1969, which is reported at D.C., 298 F.Supp. 1309. In this opinion FF refers to formal findings of fact on the issues relating to use of the trademarks and JA to joint appendix
 
 
 [4]
 In 1920 the Grand Duchy of Saxe-Weimar-Eisenach was dissolved and incorporated into the newly established Land of Thuringia, a state in the German Federal (Weimar) Republic. In 1952, the Land of Thuringia was dissolved, and since then Jena has been located in the District of Gera, a new political subdivision of the German Democratic Republic, which had been established in October, 1949
 
 
 [5]
 The Statute provided that the domicile of the Foundation should be Jena (Section 3), that this provision could not be amended or rendered inoperative (Section 121), and that its Works (including the Zeiss and Schott Works) should not be transferred outside the immediate neighborhood of Jena (Section 39). Upon dissolution one half of the "remaining value of assets" was to be distributed between Jena and a neighboring community, the other half to go to the University of Jena (Section 116)
 
 
 [6]
 As set forth in the district court's discussion of the facts: "[A] private `Stiftung,' or Foundation, is a legal entity or juristic person with some attributes similar to those of a corporation under American law, including the capacity to own property, enter contracts, engage in business activities, sue and be sued, etc. It differs from a stock corporation (known as an `AG' under German law) in that it has no stockholders. On the other hand, the absence of stock ownership does not mean that it is therefore a public, non-profit, charitable or eleemosynary enterprise. It is more in the nature of a trust to which the attributes of separate legal existence as an entity are extended." JA 969
 
 
 [7]
 Each Board of Management was to consist of three or four members appointed for a fixed period or for life. Only an employee having a lifetime contract of employment was eligible for appointment. Two members of each Board were appointed by the Special Board as the "Mandatory" and "Deputy Mandatory." Membership on a Board could terminate only by voluntary resignation accepted by the Special Board, expiration of a fixed period of appointment, or termination or cancellation of the lifetime employment contract, which could be effected only for gross violation or neglect of duty or disreputable behavior
 
 
 [8]
 The use of the trade names and marks by both parties in the United States is set forth in more detail later herein
 
 
 [9]
 The total number of employees of the various enterprises in which the Carl Zeiss Foundation had an interest was approximately 45,000 when the American Armed Forces first occupied Jena. Approximately 15,000 were employed in Jena and its vicinity, and 30,000 at outside locations. The employees in the plant at Jena included 2,000 foreign workers and 3,000 conscripted laborers. By June, 1945 the 5,000 nonregular workers had left the employ of the Zeiss firm (FF 49, 50, 51). JA 830-831
 
 
 [10]
 Esau and all members of both Boards had been members of the Nazi party. Their designees had not been identified with the Party. Each designee had been employed for over ten years but did not have a lifetime contract. Lifetime contracts of employment were executed by Schomerus and Schrade
 Kueppenbender, Schott and Schrade testified at the trial. All remaining members of all Boards were then deceased.
 
 
 [11]
 The district court said in part: "After carefully reviewing the evidence and appraising the witnesses (including Kueppenbender, Schott and Schrade), we find that the credible evidence establishes that while the Zeiss Board members evacuated to Heidenheim granted broad management powers to Schomerus, Sandmann and Schrade * * * and later even agreed temporarily to refrain from exercising their own powers as Board members and to permit the latter to hold themselves out as the `Board of Management' in order to appease Soviet occupation authorities, the Zeiss Board never resigned." JA 987-988. The court rejected Schrade's testimony because of his "obvious interest and his demeanor as a witness" and because it was "inconsistent with his prior testimony on the subject." JA 989
 
 
 [12]
 The court's findings on this issue are summarized in its discussion of the facts as follows:
 "The makeshift arrangements served temporarily to appease the Russians. The Jena management, although but caretakers, maintained its appearance as the Boards of Management to the Russians, thereby avoiding removal by the Soviet occupation authorities and replacement by communist functionaries, but secretly recognized the Boards in Heidenheim as the official management by not requiring a resignation, by not pursuing their removal, and by assuring them that upon their return to Jena they would resume actual management of Zeiss business in the Soviet Zone. In the meantime the Boards in Heidenheim continued to lend themselves to the facade for the purpose of avoiding Soviet seizure by acting in the West under the powers of attorney from Jena rather than asserting their true powers as the Board." JA 1008.
 
 
 [13]
 In the summer of 1946 the Zeiss group obtained space in a factory in Oberkochen. In October, 1946 a limited liability company was organized in Heidenheim under the name of "Opton GmbH." Its principal assets consisted of the Oberkochen production facilities (FF 200-203). JA 889-890
 
 
 [14]
 The court said further: "The properties in Jena were thenceforth not to be managed by a Deputy and Boards of Management but by direction of the State, which specified what funds would be appropriated and furnished for their continued operation. The Abbe Statute never authorizd a state-directed and state-controlled eleemosynary institution. On the contrary, Abbe expressly stated he didnot intend such an enterprise." JA 1017.
 
 
 [15]
 The bases for the new domicile are summarized in the district court's discussion of the facts as follows: (1) the Zeiss Foundation was a German federal entity; (2) Germany, despite its occupation by the four Allied Powers remained a single unitary sovereign state being administered by the occupants pursuant to Article 43 of the Hague Regulations; (3) Article 87 of the German Civil Code authorized creation of an additional domicile, or a change in domicile, for the Foundation because the Soviet expropriation made it impossible for it to fulfill its purposes in the East by preventing it from conducting its essential commercial operations; and (4) Wuerttemberg, as a member state of the German Federal Government, had the power to effectuate such implementation of Article 87. JA 1029-1030
 
 
 [16]
 Notice of this decree apparently did not come to the attention of VEB in Jena until sometime in November, 1951, when it was apprised of the decree in connection with a proceeding pending in the German Patent Office in Munich (FF 310). JA 921
 
 
 [17]
 A further Administrative Decree was issued in May 1954 by the Minister of Education of Wuerttemberg amending the Statute of the Carl Zeiss Foundation to eliminate Jena as a legal domicile (FF 311). JA 921-922. On August 3, 1967 the Parliament of the Federal Republic of Germany adopted legislation purporting to confirm the validity of measures taken to transfer such domiciles to West Germany (FF 320). JA 923-924
 
 
 [18]
 This testimony was given by "Richter, an experienced German lawyer who was then head of the legal department of the East Germany Ministry, and Schacht, another trained German lawyer acting as a Jena VEB's counsel in the matter." JA 1034
 
 
 [19]
 In its discussion of the facts, the district court continued: "It represents a pseudo-type organization, deliberately established by East Germany as a sham or facade for litigation purposes, with a view to trying to create a color of right to assets outside of East Germany, including Zeiss trademarks. * * * The record reveals beyond any serious doubt that following the Soviet expropriation and break-up of the Foundation in 1948, the East German authorities had no intention of ever permitting its resurrection as a viable entity conforming to the original Statute, but they considered it dead. This is vividly confirmed by the fact that the June 27, 1951 appointment of the so-called `organs' for the Zeiss and Schott Works were expressly retroactive to June 27, 1945." JA 1035-1036
 
 
 [20]
 At the beginning of 1953, the Carl Zeiss Firm in Heidenheim was advised that the sale of products produced in Jena by VEB for export had been taken over by a state trading organization known as "DIA" (FF 381). JA 937
 
 
 [21]
 In considering the effect of the nationalization of the Zeiss and Schott enterprises in Jena, Judge Mansfield properly distinguished the post-war expropriation in 1948 from the military reparations in 1945
 
 
 [22]
 The cases cited by Judge Mansfield support both conclusions. We deem it unnecessary to repeat in this opinion his discussion of the applicable law on this and other issues. Instead we shall refer to the page at which each principle of applicable law is discussed in the reported opinion
 
 
 [23]
 The district court recognized that "our Government's diplomatic recognition policy is entitled to considerable weight in determining what law is to be applied"; that "the invocation of the policy is complicated in the present case by the fact that the Court is dealing with a divided country, West Germany being recognized as sovereign only over its own territory and not over that of East Germany, which remains unrecognized by the United States"; and that "[c]hoice of law rules normally assume the existence of a territory having an appropriate relationship to the issue, over which the recognized foreign government claims sovereignty." p. 900
 
 
 [24]
 The court rejected appellants' contention that a foundation is strictly a creature of the state which approved the founder's statute or charter, and the supporting testimony of German law experts offered by the appellants, finding the testimony of Professor Steindorff, offered by the appellees, to be more credible, persuasive, and reliable
 
 
 [25]
 Notice of commencement of the action was sent to the Zeiss firm in Heidenheim, but acceptance was refused and the envelope was returned to the district court in Leipsig unopened, with a cover letter denying jurisdiction of the East German courts on the ground that they were not legally constituted (FF 409). JA 944
 
 
 [26]
 Copies of these decisions have been included in an appendix to the briefs: Carl-Zeiss-Stiftung v. Rayner & Keeler, Ltd., [1964] R.P.C. 299, aff'd [1966] 2 All E.R. 536; Carl-Zeiss-Stiftung v. Rayner & Keeler, Ltd., [1969] 3 All E.R. 897; VEB Carl Zeiss, Jena v. Firma Carl Zeiss, Heidenheim, [1965] Entscheidungen des Schweizerischen Bundesgerichts 117 (Swiss Federal Supreme Court); Carl-Zeiss-Stiftung of Heidenheim v. Carl Zeiss Stiftung, Jena, PLD 1968 Karachi 276 (High Court of West Pakistan); Jenaer Glaswerk Schott & Gen., Mainz v. VEB Jenaer Glaswerk Schott & Gen., Jena, Oslo Town Court (Norway), March 18, 1969; Carl Zeiss Stiftung, Heidenheim v. Carl Zeiss Stiftung, Jena, not reported (Indian Joint Registrar of Trademarks), March 12, 1968; Re Carl Zeiss Pty. Ltd.'s Application, [1969] 43 ALJR 196 (Australia)
 
 
 [27]
 This is the most recent and we believe the most significant of the foreign decisions. For that reason we deem it advisable to refer in some detail to its clarifying and limiting effect
 
 
 [28]
 In further clarification of the prior holding, Justice Buckley, after pointing out that Justice Cross had concluded "that in the contemplation of East German law the plaintiff is the original stiftung," continued:
 "* * * On the other hand, he held, that in contemplation of West German law the `foundation,' by which I think he clearly meant the original stiftung, was `domiciled' in Heidenheim under the two Wüttemberg decrees. In these circumstances I think that it is reasonably clear that the learned judge was not expressing a concluded view that the plaintiff was for all purposes to be regarded as the original stiftung and that the third defendant was not to be so regarded for any purpose, but merely the view that, since the status of the plaintiff as a competent plaintiff in this action was to be ascertained in the light of the plaintiff's own proper law, namely East German law, the plaintiff must be accepted as having a corporate existence under that law, and that the council of Gera must be accepted as having authority to instruct solicitors on its behalf."
 
 
 [29]
 Without pursuing further the holdings in the foreign decisions, it may be said in general that the proof submitted in the district court in this case apparently was the most complete of that offered in any of the cases heard to date, and that few cases thus far have reached any final determination on the merits
 
 
 [30]
 The opinion of the district court sets forth in detail the events between 1949 and 1962 in support of this conclusion, and we deem it unnecessary to repeat them
 
 
 [31]
 Appellee Foundation did not itself distribute the Jena goods in the United States. They were shipped to the United States directly by the Jena enterprise
 
 
 [32]
 See Tillamook County Cream. Ass'n v. Tillamook Cheese & D. Ass'n, 345 F.2d 158, 162 (9th Cir. 1965), and cases there cited
 
 
 [33]
 See Avon Shoe Co. v. David Crystal, Inc., 279 F.2d 607, cert. denied 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960); Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, cert. denied 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); Triumph Hosiery Mills, Inc. v. Triumph Int'l Corp., 308 F.2d 196 (1962); Chandon Champagne Corp. v. San Marino Wine Corp., 335 F.2d 531 (1964); Miss Universe v. Patricelli, 408 F.2d 506 (1969)
 
 
 [34]
 In general the cases clearly support the conclusion of the district court that "where the products of the respective parties are not directly competitive, the plaintiff's interest in securing equitable relief may be entitled to less weight than where the infringer markets a competitive product." 293 F.Supp. p. 918
 
 
 [35]
 Another factor entitled to consideration in determining whether joint use should be allowed is the expense incurred by the respective parties in advertising and promoting the trade names, marks and products. Stork Restaurant, Inc. v. Sahati, 166 F.2d 348 (9th Cir. 1948); Anheuser-Busch, Inc. v. DuBois Brewing Co., 175 F.2d 370 (3d Cir. 1949), cert. denied 339 U.S. 934, 70 S.Ct. 664, 94 L.Ed. 1353 (1950)
 It is clear in this case that appellees have incurred the major portion of the expense of promoting the Zeiss trademarks. As noted supra, between 1953 and 1966 sales of the Zeiss firm of Heidenheim in the United States totaled $56,803,069, and Carl Zeiss, Inc. expended $5,893,498 in advertising and promoting the trade names and marks and the products manufactured by appellees (FF 468). JA 957. The total sales of appellants from 1948 through 1966 amounted to $6,709,491 (FF 473, JA 956) — slightly more than Carl Zeiss, Inc. expended in advertising and promotion.
 
 
 [36]
 In Miss Universe, Inc. v. Patricelli,supra, we recognized that the findings of the district court with respect to the "existence of actual confusion and the alleged infringer's intent — are subject to the `clearly erroneous' standard normally applicable to findings of fact." 408 F.2d at 509.
 
 
 [37]
 The findings of the district court in the trial of the antitrust issues, entered March 12, 1969, contain the following: "During the period from approximately 1956 to 1959 defendants sold goods in the United States manufactured by V.E.B. Carl Zeiss Jena from which the Zeiss trademarks had been obliterated and on which only the symbol `CJZ' appeared. Prior to 1956 and after 1959 instruments bearing the Zeiss trademarks were sold by Ercona in the United States. A comparison of Ercona's volume of sales of such instruments for the entire period fails to show any causal connection between the Zeiss trademarks and Ercona's sales volume fluctuated up and down from year to year, revealing that two of the years (1956, 1959) in which the marks were obliterated produced a greater annual volume than five of the years (1952-1955 and 1961) in which the marks were on the instruments" (Finding 7). JA 1186-1187