**THE FOURTH TORO FAMILY LIMITED PARTNERSHIP,**
Plaintiff,

**PV BAKERY, INC., Defendant.**

**No. 97 CIV. 9009(AKH).**

United States District Court,
S.D. New York.

March 8, 2000.

Eric Weinstein and Seth Flaum, New York City, for Plaintiff and Cross–Defendant.

Richard A. Spehr, Mayer, Brown & Platt, New York City, for Defendant and Cross–Plaintiff.

## MEMORANDUM AND ORDER

HELLERSTEIN, District Judge.

To New Yorkers and transplanted New Yorkers, a bagel[1] is quintessentially New York. The doughnut-shaped bread, boiled in water and baked to produce a crisp, mellow-brown skin and a delectable, chewy interior is an American success story. Brought to the United States by Jewish immigrants from Eastern Europe, the bagel has emerged from the obscurity of the tenements to become an American icon as beloved as apple pie. Yet, despite its far reaching achievements, the bagel remains a product of New York, judged for its taste and quality according to its degree of variation from a perceived New York ideal.

Helmer Toro and Hector Hernandez, immigrants from Puerto Rico, took up the path marked by earlier immigrants to New York City; they opened a bagel store and developed recipes and formulae, the reliable quality and taste of which won public acceptance. Their incorporated name—H & H Bagels, Inc.—became distinctive. This lawsuit contests the rights to that valuable name for bagels—H & H.

### Background

In 1972 after active service in Vietnam, Helmer Toro and his brother-in-law Hector Hernandez opened a bagel store on Broadway and 80th Street on the West Side of Manhattan, incorporated as H & H Bagels, Inc.[2] and known as H & H Bagels. Two years later, Helmer and Hector opened a second bagel store on the East Side, on Second Avenue and 80th Street. The second store was separately incorporated as Yorkville Bagels, Inc., and assumed the tradename "H & H Bagels Midtown East." The bagels sold in both stores were baked according to the same recipe, and found substantial acceptance by the consuming public. Compl. ¶ 15.

In 1979, Hector and Helmer, seeking to expand H & H's wholesale bagel-baking

---

1. The word bagel is believed to derive from the Yiddish word beygl and the German word bugel, meaning a round loaf of bread. Bagel is also thought to be rooted in the German word for stirrup, buegel. According to legend, the bakers of Vienna commemorated John III's victory over the Turks in 1683 by baking bread to resemble the stirrups, or buegels, of the victorious king. John F. Mariani, Dictionary of American Food and Drink 22 (1983). The Second Circuit has referred to bagels "as hard rolls shaped like doughnuts," although noting that the "description is like calling a sunset a collection of colors." *NLRB v. Bagel Bakers Council of Greater New York,* 434 F.2d 884, 886 (1970) *cert. denied,* 402 U.S. 908, 91 S.Ct. 1380, 28 L.Ed.2d 648 (1971).

2. H & H Bagles (sic), Inc. was incorporated on March 8, 1972 by Philip Toro "to manufacture and sell wholesale and retail bagles (sic) and by-products." Helmer and Hector Toro were the principals. Compl. ¶ 9.

operations, purchased a factory in the Bronx and incorporated it as North East Bakeries, Inc. The operation failed; loans cross-guaranteed by H & H Bagels, Inc. and Yorkville Bagels, Inc. were called, and a consolidated chapter 11 bankruptcy of all three companies resulted. An Examiner was appointed, and he determined, with the approval of the creditors and pursuant to an order of the bankruptcy court, that there should be an auction of both the West Side and the East Side stores, and that bidders could make offers on each store separately and on both combined, whichever would result in greater value to repay creditors.

Plaintiff bid for both stores, but was awarded only the West Side Store. Another bidder, Gotham Bagels, Inc., presented a winning, higher bid to acquire the East Side store. The Examiner issued separate bills of sale, conferring different rights, to each. In the years that followed, the West Side store and its original, continuing owners, using their H & H tradename, enjoyed growing and substantial revenues and profits, and ever greater renown. The East Side store was less successful, passing through successive managements which, under the tradename "H & H East," primarily sold to customers in their East Side neighborhood. The current owner of the East Side store, the defendant in this action, PV Bakery, Inc., initiated a more aggressive marketing program, seeking to compete in the same markets in a manner that impermissibly encroached on the H & H mark with the closely similar "H & H East" tradename. This lawsuit was the result.

### The Current Action

The parties dispute their respective claims of right to the name H & H. The Fourth Toro Family Limited Partnership, the Plaintiff, claims exclusive right to the name H & H, and sues to prevent PV Bakery, Inc., the Defendant, from using it and for damages, invoking the Trademark Act, 15 U.S.C. §§ 1125(a), 1114($l$), section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), section 368–d of the New York State Business Law and the common law of unfair competition.[3] PV counterclaims, alleging that it, not Fourth Toro, has exclusive right to the H & H name, and that it is entitled to injunctive relief and damages.

Specifically, the parties contest plaintiff's exclusive right to Trademark Registration No. 1,736,851, issued December 1,

---

**3.** 15 U.S.C. § 1125(a) provides in pertinent part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.
15 U.S.C. § 1114(a) provides in pertinent part:
(1) Any person who shall, without the consent of the registrant—
(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive shall be liable in a civil action by the registrant for the remedies hereinafter provided.
Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), provides in pertinent part:
(1) The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection.
Section 368–d of the New York Business Law, Repealed L.1996, c. 319, § 2, eff. Jan. 1, 1997, now codified in § 360–1 (McKinney Supp.1999).

1992 on application of December 24, 1990, for the slogan "H & H Bagels like no other bagel in the world," with a design including "H & H" on a stylized shopping bag. Plaintiff filed three additional applications for "H & H Bagels," and for the design "H & H" and the slogan "Like No Other Bagel in the World," on September 16, 1996. Compl. ¶ 25. Defendant filed Notices of Opposition with the Trademark Office to the three pending applications, and a Petition for Cancellation of Registration No. 1,736,851. Compl. ¶ 26.

I hold, for the reasons expressed in this opinion, that both Fourth Toro and PV have rights to the name H & H, but unequally, with Fourth Toro having the stronger right.

### Facts

The contest for the right to the H & H name stems from the stores' consolidated bankruptcy. Hector and Helmer continued to manage the two retail stores during the chapter 11 proceedings. In 1995, in anticipation of the Examiner's proposed sale of the two stores, Hector and Helmer incorporated The Excellent Bagels, Inc. and bid for both stores: $515,000 for the West Side store, $110,000 for the East Side store, and $625,000 as a combined bid. On April 15, 1985, Excellent Bagels was awarded the West Side store, but its bid was not the high bid for the East side store: Gotham Bagels, Inc., with a winning bid of $125,000, was awarded the East side store.

The bills of sale from the Bankruptcy Examiner to the two buyers defined the parties' respective rights to the H & H name. Hector and Helmer, through their company Excellent Bagels, purchased, by bill of sale dated April 23, 1985, not only the assets to the West Side store but, with those assets, the "goodwill and any other transferable intangibles of the Debtor ... including the tradename H & H Bagels

(the business being sold)."[4] Specifically, the West Side store's bill of sale provides:

> The Debtor has sold, assigned and transferred by these presents, and does sell, assign and transfer unto The Excellent Bagels, Inc. its successors and assigns, any and all of its right, title and interest in and to [certain physical assets] .... Included in the sale are goodwill and any other transferable intangibles of the Debtor ... including the tradename H & H Bagels (the business being sold).

The bill of sale to Gotham for the assets of the East Side store, dated two days later, April 25, 1985, conveyed the Debtor's "right, title and interest in and to the tradename Yorkville Bagels, Inc., d/b/a H & H Midtown Bagels East ...," but not the Debtor's "goodwill" or "transferable intangibles." The bill of sale for the East Side store provides:

> JOHN S. PEREIRA, as Examiner in Bankruptcy of H & H BAGELS, INC., and YORKVILLE BAGELS, INC., d/b/a H & H BAGELS EAST, Debtors, in a proceeding Under Chapter 11 ... has sold, assigned and transferred by these presents, and does sell, assign and transfer unto Gotham Bagels, Inc., its successors and assigns, any and all of its right, title and interest in and to the tradename Yorkville Bagels, Inc., d/b/a H & H Midtown Bagels East, the furniture, fixtures, inventory, machinery and equipment, and all of other physical assets of the Debtor contained in the former premises of the Debtor located at 1551 Second Avenue, New York, New York ...

The distinction made in the two bills of sale is crucial: Excellent (Hector and Helmer's company) acquired the "H & H Bagels" name and its attendant "goodwill"; Gotham (the East Side store) acquired

---

4. The Excellent Bagels, Inc. assigned its right, title and interest on May 28, 1989 to the First Toro Family Limited Partnership. First Toro, on December 29, 1994, assigned its right, title and interest to plaintiff, Fourth Toro Family Limited Partnership, and Fourth Toro continues to hold the interest.

only the precise tradename, H & H Midtown Bagels East.

### The West Side Store

H & H Bagels has established itself as a culinary landmark on Manhattan's Upper West Side, producing more than 100,000 bagels daily and 36 million bagels a year: plain, cinnamon-raisin, pumpernickel, sesame, poppy and other varieties. A worldwide network of wholesale and retail stores distribute H & H's bagels from Mississippi and Wisconsin to Jerusalem and Tokyo. H & H's bagel-eaters buy and enjoy the breadstuff in Belgium, Canada, the Dominican Republic, France, Germany, Haiti, Israel, Japan, Jordan, Luxembourg and the Netherlands. Flaum Decl. at 4–5. By 1997 when this lawsuit was filed, Fourth Toro's annual revenues had grown to $11,360,307. Pl. Brief at 6.

The H & H Bagels' name has been spread by extensive advertising in local, regional and national media.[5] H & H Bagels have been featured in select catalogs including Bloomingdale's by Mail, Gourmet Magazine and Starbucks. Press reports and guidebooks wax eloquent in characterizing the bagels' distinctive qualities: "the deftly modulated dough, the scent emanating from a warm bag that in itself will precipitate a Freudian regression" (New York, *Bagels*, Apr. 17, 1995)[6]; "that Microsoft among bakeries, which ships bagels to celebs like Kevin Bacon and Cher and to anyone else in the world who dials their 800 number" (Saveur Magazine, *Lament for the Bagel*, November 1998 at 132); "[o]ne of the larger palaces of unpretentious delights" (Where New York, *Let's Schmear!*, June 1997 at A64); and "a definitive bagel." (Engel, Allison and Margaret, Food Finds 28 (1991)). The store operates under a respected kosher certification and has participated at "Kosherfest," a Kosher food trade show.[7]

H & H Bagels has also become known through corporate promotions, charitable donations and publicity events. As part of the Fourth Annual New York Restaurant Week, H & H constructed the NY96 Tower of Bagels of 1,432 H & H Bagels (1,144 of which were regular-sized and 288 jumbo 21–inch bagels in assorted flavors). Four hundred pounds of H & H bagels traveled from New York to Lillehammer, Norway for a CBS celebration of the 1996 Winter Olympic Games.

### The East Side Store

The East Side store, calling itself "H & H East,"[8] was considerably less successful than the West Side store, grossing $2,191,908 in 1997, barely a fifth of the West Side store's revenues.[9] While the West Side store grew under one, continuous ownership, the East Side store passed through successive managements; defendant is its fourth owner since the Examiner's bankruptcy sale in April 1985.

Defendant's marketing and promotional efforts appear to be recent and modest compared to H & H's marketing.[10] Advertisements for the East Side store have appeared locally in N.Y. Weekly and the Pennysaver, and nationally in the National Herald, a Greek–American paper.[11] More

---

5. H & H advertised extensively throughout the 1990s, in the general New York region (the New York Times, Jewish Week, The Forward and the Jewish Press); locally in Manhattan neighborhoods (Chelsea/Clinton News, Westsider, Manhattan Spirit, Upper West Side Resident/and Midtown Resident); and nationally in Gourmet and Eating Well.

6. The article specifically differentiates between the West and East Side stores. ("West Side, of course; not East").

7. H & H's bagels are certified Kosher by Kof–K. Pl. Undisputed Facts ¶ 53.

8. *See* Ans. ¶ 7.

9. Average revenue over 8 years from 1990–1997 was $1,716,813.82. Def. Undisputed Facts ¶ 79.

10. Defendant did not present evidence of its predecessors' marketing.

11. According to plaintiff's brief at 21, PV's wholesale business is confined to New York City with the exception of two jobbers who deliver to Connecticut and one to Long Island.

recently, Defendant's marketing has become increasingly aggressive, and focused on the H & H name. Like the West Side store, defendant now advertises a toll-free number, almost identical to the West Side store's number.[12] Like plaintiff, defendant also began to use a mail order catalog, also featuring the H & H name. Like plaintiff, defendant also obtained kosher certification, but of a certifying agency enjoying a lesser reputation, reflecting lesser standards, "Tablet–K," rather than "Kof–K." see Rodriguez Dec. ¶ 6.[13]

Defendant's broadened and more aggressive use of its tradename "H & H Bagels East" has created actual instances of confusion. The Zagat's Guide to Restaurants in New York City for 1997, listed both the West and East Side location under "H & H Bagels." Flaum Decl. Ex. Y.[14] An incident in 1996 or 1997 concerning an unfortunate spate of publicity regarding the appearance of a rat at the West Side store incorrectly prompted customers to complain to the East Side location. Alexiou Dep. at 99–100, Weinstein Reply Decl. Ex. D.

### Summary Judgment

Plaintiff and defendant have both moved for summary judgment, each claiming exclusive right to the H & H name, each asserting on the basis of the pleadings and the discovery that there is no issue of fact to be tried.

■ The standards applicable to summary judgment motions apply, generally, to cross-motions as well. *Aviall, Inc. v. Ryder System, Inc.*, 913 F.Supp. 826, 828 (S.D.N.Y.1996) *aff'd*, 110 F.3d 892 (2d Cir. 1997); *MG Refining & Mktg., Inc. v. Knight Enterps., Inc.*, 25 F.Supp.2d 175, 180 (S.D.N.Y.1998). Although the parties

"have implicitly agreed that no material issues of fact exist," the court must still decide that issue for itself. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). I may grant summary judgment only if the pleadings and written discovery together with the affidavits show that there is no issue of fact to be tried, that judgment may be granted as a matter of law. Fed.R.Civ.P. 56(c) (1999); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Gallo v. Prudential Residential Servs. Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir.1994). If either party satisfies its initial burden showing that no material fact is in dispute, the other party must show by "specific facts" that a genuine issue of material fact necessitates a trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### The Parties' Source of Rights

■ Both parties trace their rights to a single source: the asset sales to each by the Bankruptcy Examiner. Their bills of sale, set out earlier, provide the parties' comparative rights.

Plaintiff acquired, with the assets of the West Side store, the "goodwill and any other transferable intangibles of the Debtor ... including the tradename H & H Bagels (the business being sold)." Defendant acquired the "right, title and interest in and to the tradename Yorkville Bagels, Inc., d/b/a H & H Midtown Bagels East." Thus, plaintiff acquired the trade name— "H & H Bagels," the "goodwill" associated with that name, and the clarifying intent

---

**12.** Plaintiff's "800" number is—800–NY–BAGEL; Defendant's is—800–49–BAGEL. Defendant's number has but one digit that is different from plaintiff's number.

**13.** *See Levy v. Kosher Overseers Assoc. of America, Inc.*, 104 F.3d 38, 39 (2d Cir.1997) (describing the significance of kosher certification marks). The East Side store sells non-

kosher foods as well as kosher and heats these together in the same oven, a practice apparently permitted under the "Tablet–K" certificate; the West Side store does not sell non-kosher goods, and the "Kof–K" certificate forbids such practices.

**14.** Notably, Zagat's 1991 edition listed only the West Side store's location.

that "H & H Bagels" was the "business being sold." Defendant acquired less: the assets of the East side store and the particular trade name—"d/b/a H & H Midtown Bagels East." Thus, defendant's argument, that the Bankruptcy Examiner gave it the same right as plaintiff to exploit the H & H name, is without merit.

Defendant's effort to arrogate the status of its assignor, the debtor in possession, is without merit. Although, generally, "an assignment of a trademark and its accompanying goodwill [15] will entitle the assignees to 'step into the shoes' of the assignor, gaining whatever priority rights the assignor might have had in the mark," see, e.g., Clark & Freeman Corp. v. The Heartland Co., Ltd., 811 F.Supp. 137 (S.D.N.Y. 1993); Johanna Farms, Inc. v. Citrus Bowl, Inc., 468 F.Supp. 866, 874 (E.D.N.Y. 1978), the Examiner in the case before me divided the assets and associated good will of the debtor-in-possession, and transferred them unequally to the plaintiff's and defendant's predecessors. And plaintiff and defendant knew that each was acquiring a different quality of rights. Each received the goodwill attendant to a particular set of assets, but plaintiff acquired the goodwill to the tradename "H & H Bagels" without limitation or qualification. Defendant, in contrast, acquired the particular "doing business" name, "H & H Midtown Bagels East" and, by implication at best, that quality of goodwill that was attendant to that particular tradename, "H & H Midtown Bagels East."

Therefore, the Bankruptcy Examiner was not the usual assignor, assigning, indivisibly, all rights to a single purchaser. Defendant's predecessor acquired its rights in the particular context of competitive bidding for two stores, knowing that the Examiner, just two days before, on April 23, 1985, had already assigned the

"H & H Bagels" tradename generally, and the goodwill attendant to the H & H name. Plaintiff thus acquired the right to use and exploit the H & H tradename without restriction, and Defendant acquired less. The doctrine forbidding an assignment in gross, see Universal City Studios, Inc. v. Nintendo Co., 578 F.Supp. 911, 922 (S.D.N.Y.1983) aff'd, 746 F.2d 112 (2d Cir. 1984), cannot in these circumstances increase defendant's interest to become the equivalent of that which plaintiff acquired.

Defendant claims that the deposition testimony of the Bankruptcy Examiner supports the argument that the Examiner intended to "convey the unrestricted right to the use of the H & H name and mark equally to both plaintiff and defendant herein." Def. Mem. at 6 (citing to Rule 56.1 Statement ¶¶ 51–52; Spehr Aff. Exs. O, P).[16] However, that which a seller may have subjectively intended or claimed to have intended is irrelevant, for intent is found, not from parol evidence, but from the unambiguous provisions of a bill of sale. See, e.g., International Klafter Co. v. Continental Casualty Co., 869 F.2d 96, 100 (2d Cir. 1989) ("It is a fundamental principle of contract interpretation that, in the absence of ambiguity, the intent of the parties must be determined from their final writing and no parol evidence or extrinsic evidence is admissible."); Namad v. Salomon Inc., 74 N.Y.2d 751, 545 N.Y.S.2d 79, 543 N.E.2d 722, 723 (1989) ("Parol evidence is inadmissible if a contract is clear on its face and sufficient alone to divine the intent of the parties," citing 4 Williston, Contracts §§ 631, 632A, at 974, 985–986 [3d ed.1961] ); Diesel Construction Co. v. Chase Manhattan Mortgage & Realty Trust, 58 A.D.2d 760, 396 N.Y.S.2d 239 (1st Dep't 1977), aff'd, 44

---

**15.** Although the bill of sale does not explicitly convey goodwill to the East Side store, a trademark cannot be assigned apart from its goodwill. Since trademark law requires a transfer of goodwill, the East Side store is presumed to have received only that much goodwill inherent in the name "H & H Midtown Bagels East." See 15 U.S.C. § 1060.

**16.** This argument is also at odds with the Defense's claim that PV Bakery possesses exclusive and superior rights to the H & H name.

N.Y.2d 871, 407 N.Y.S.2d 694, 379 N.E.2d 220 (1978); *Brinderson–Newberg Joint Venture v. Pacific Erectors, Inc.*, 971 F.2d 272, 280 (9th Cir.1992) ("If strained interpretations are accepted as reasonable, the parol evidence rule will be completely eviscerated, and integrated contracts will be unenforceable."). The parol evidence rule is substantive New York law, and not merely a rule of evidence. *Unisys Corp. v. Hercules Incorp.*, 224 A.D.2d 365, 368, 638 N.Y.S.2d 461 (1st Dep't 1996).

Plaintiff, by purchase from the Bankruptcy Examiner, thus gained the right to continuing use of the tradename H & H Bagels, without limitation and without qualification. Defendant acquired a lesser right, to use of the tradename "H & H Midtown Bagels East."

### Likelihood of Confusion

 The purpose of trademark law is to protect the public from confusion as to the source of goods and to protect the trademark holder from misappropriation of its mark. *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 740 (2d Cir.1994). Accordingly, a second comer is generally forbidden from adopting a name that is confusingly similar to a mark already distinctive. The record in this case shows that consumers are likely to believe that the stores are affiliated or constitute or belong to a single entity.[17] H & H is an arbitrary tradename, denoting a particular source for bagels.[18] H & H and "H & H East" are confusingly similar.

The relative inexpensiveness of bagels increases the likelihood that consumers will be confused. A purchaser of bagels sees them loose in a bin, generally without any mark or distinction. It is only when handled or tasted that the quality of a bagel is discovered. In such situations, the law reflects special concern that the products of one maker not be passed off

for another. *See e.g., RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir.1979) (adopting trial court finding that "products' modest cost was not conducive to the exercise of careful selectivity by purchasers."); *Tri–Star Pictures v. Leisure Time Productions*, 14 F.Supp.2d 339, 358 (S.D.N.Y.1998) ("unsophisticated consumers exacerbate the likelihood of confusion, especially where the marks are similar, inexpensive and in competitive proximity").

Instances of actual confusion are positive proofs that confusion is likely. *Lambda Electronics Corp. v. Lambda Technology, Inc.*, 515 F.Supp. 915, 926 (S.D.N.Y. 1981). I have previously described the several instances of actual confusion that have come to light—for example, the Zagat's Guide's listing and the publicity regarding a rat at the West Side store. *See Harold F. Ritchie, Inc. v. Chesebrough–Pond's, Inc.*, 281 F.2d 755 (2d Cir.1960) (finding of confusion as to identical product). This case presents ample evidence meeting the standard that likelihood of confusion exists. As set forth in *Polaroid Corp. v. Polarad*, 287 F.2d 492, 495 (2d Cir.) (Friendly, J.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961) several criteria are to be balanced: the similarity of plaintiffs' and defendants' marks, the competitive proximity of the products, whether or not there has been actual confusion, the relative quality of the products, and the sophistication of the buyers, among others. All these criteria point strongly to a likelihood of confusion.

### Limitations and Laches

Defendant argues that since it sold its products under the tradename "H & H East" for a 12 year span of time, between the time Gotham Bagels acquired the East Side store to the filing of suit, plaintiff is barred by limitations and laches from

---

**17.** The parties concede that the mark "H & H Bagels" has attained secondary meaning in the public mind. *See* 2 McCarthy on Trademarks and Unfair Competition § 15:4 (secondary meaning connotes a "mental associa-

tion in the buyers' minds between the alleged mark and a single source of the product.").

**18.** *See id.* at § 11:11.

bringing this lawsuit. In opposition, plaintiff argues that it did not sue because defendant's sales were relatively small, and were largely confined to retail sales in defendant's geographical area, around Second Avenue and 80th Street, Manhattan's Upper East Side, and that heightened, more-recent promotions trading on the name H & H Bagels caused the lawsuit. Plaintiff adds that its filing for exclusivity of trademark use of the "H & H Bagels" tradename in December 1990, five years after the Bankruptcy Examiner's sale and the registration issued by the Trademark Office in December 1992, followed by the three additional applications for registration that it filed on September 16, 1996, sufficiently showed its interest in protecting its tradename.

■ The Lanham Act does not provide a specific statute of limitations. 15 U.S.C. § 1051 et seq. In the absence of such a specific statute, an analogous statute of limitations may be applied. *See DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983) (where no federal limitations period applies, most closely analogous federal or state limitations period governs ); *Conopco, Inc. v. Campbell Soup Co.,* 95 F.3d 187, 191 (2d. Cir.1996) (New York's six-year period of limitations held most analogous to govern unfair competition and false advertising claims), *see* N.Y. Civ. Prac. L. & R. § 213 (McKinney 1990).

■ First, as to limitations, defendant's use of "H & H East" was, if wrongful, a continuing tort. As such, plaintiff would have the right to sue for damages suffered within the six-year period preceding the filing of suit. *Hester Indust., Inc. v. Tyson Foods, Inc.,* 94 Civ. 391, 1995 WL 113939 at *5 (N.D.N.Y.) (trademark infringement and dilution are continuing torts that "give rise to a fresh cause of action so long as the wrong persists"), *citing R.G. Barry Corp. v. Mushroom Makers, Inc.,* 108 Misc.2d 113, 436 N.Y.S.2d 927 (N.Y.Sup.Ct.1981) *aff'd,* 85 A.D.2d 544, 444 N.Y.S.2d 922 (1st Dep't 1981). The issue, whether or not plaintiff

can sue for injunctive and other equitable relief, is determined by consideration of laches, generally not by a statute of limitations. *Tri–Star Pictures, Inc. v. Leisure Time Productions,* 88 Civ. 9127, 1992 WL 296314 at *3 (S.D.N.Y. Oct.6, 1992) *aff'd,* 17 F.3d 38 (2d Cir.) *cert. denied,* 513 U.S. 987, 115 S.Ct. 484, 130 L.Ed.2d 396 (1994).

■ In determining the applicability of laches, a "balancing of equities is required," a consideration of the circumstances of the particular case and the interests and equities of the parties. *Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1040 (2d Cir.1980) (applying laches where party acquiesced in previous reliance on the name "Saratoga"); *Carl Zeiss Stiftung v. VEB Carl Zeiss, Jena,* 433 F.2d 686, 703 (2d Cir. 1970) *cert. denied,* 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971). The issue is to be decided by the trial court, exercising its sound discretion and considering the history of comparative uses, the growth and future potential of each business and, most importantly, the interest in avoiding confusion among the consuming public. *Tri–Star Pictures,* 17 F.3d 38, 44 (2d Cir.) ("determination of whether laches bars a plaintiff from equitable relief is entirely within the discretion of the trial court"), *cert. denied,* 513 U.S. 987, 115 S.Ct. 484, 130 L.Ed.2d 396 (1994).

■ To make out a defense of laches, the defendant must show (1) that the plaintiff had knowledge of defendant's use of its marks, (2) that plaintiff inexcusably delayed in taking action, and (3) that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights by its delay in bringing suit. *Cuban Cigar Brands N.V. v. Upmann Int'l, Inc.,* 457 F.Supp. 1090, 1096 (S.D.N.Y.1978), *aff'd without opinion,* 607 F.2d 995 (2d Cir. 1979); *Saratoga Vichy,* 625 F.2d at 1040. *Carl Zeiss, supra,* 433 F.2d at 704, is instructive. There, two West German firms and an East German firm both claimed rights to the famous trademark

for optics. The West German companies claimed ownership and exclusive right as successors to the Carl Zeiss Stiftung trademark. The East German company similarly claimed exclusive or at least concurrent use of the name. After considering the West German companies' alleged delay in filing suit, the court held that a finding of laches depended on a showing that the allegedly offending party was "lulled ... into a false sense of security" that the mark at issue would not be contested. The trial court found, and the Court of Appeals agreed, that because the "circumstances reveal[ed] that [the West German companies] were neither sleeping on their rights nor leading defendants to believe that no action would be taken," the defense of laches was not made out. The same is true here.

### A. *The First Factor: Plaintiff's Knowledge of Defendant's Use*

In our case, Plaintiff's knowledge of defendant's use is not in issue. Plaintiff's predecessor knew in April 1985, when the Examiner auctioned the West Side and East Side stores to different buyers, that defendant had at least limited and qualified rights to use "H & H Midtown Bagels East" in the East Side store. The issue is not Plaintiff's knowledge, but whether or not plaintiff inexcusably delayed taking action in response to defendant's different or expanded use, if that delay prejudiced defendant, and what considerations are equitable in the circumstances.

### B. *The Second Factor: Inexcusable Delay*

Plaintiff and defendant both acquired the right to use the H & H name from the Bankruptcy Examiner, to at least some degree. Defendant's predecessor's right to use "H & H Midtown Bagels East" for its East Side store cannot be contested by plaintiff. Defendant's use of the shortened phrase, "H & H East," in light of defendant's restricted selling efforts to retail sale from its Second Avenue and 80th Street store, was not such a variance from permitted use as to require incurring the

substantial expense incident to a lawsuit. *Parrot Jungle, Inc. v. Parrot Jungle, Inc.,* 512 F.Supp. 266, 270 (S.D.N.Y.1981).

The record shows that this was the condition prior to the time that defendant, PV Bakery, Inc., became the owner of the East Side store, on November 8, 1989. PV increased the aggressiveness and the scope of its advertising, mimicking plaintiff's successful use of the H & H name in the process and creating instances of both actual, reported confusion and the likelihood of increasing confusion. As I have discussed earlier, Defendant's change in marketing focus, from a local retail seller in the East Side geographical market to a national seller, its change in manner of use of the H & H name, its adoption of a confusingly similar "800" number, and its trading on plaintiff's kosher certification created a likelihood of confusion in the marketplace.

It is not possible to chart exactly when defendant's marketing efforts outside its immediate East Side geographical area altered the competitive environment between plaintiff and defendant. Plaintiff did not act unreasonably in forbearing to sue during the period that defendant confined its selling activity largely to retail sales in its East Side geographical area. Defendant's decision to expand without its area and the manner by which it chose to expand brought conflict, and made it imperative that plaintiff take steps to protect the exclusivity of its tradename. I find that plaintiff acted reasonably in first taking action in the Trademark Office by applying for exclusive trademark protection on December 24, 1990, and obtaining the right to exclusive use by the issuance by the Trademark Office on December 1, 1992 of Registration No. 1,736,851, a recognition that enjoys presumptive validity in the courts. *See* 35 U.S.C. § 282; *Carl Zeiss, supra,* 433 F.2d at 704. Defendant did not oppose that mark. On September 16, 1996, plaintiff sought three additional, related recognitions of exclusivity from the Trademark Office. This time, defendant filed an Opposition and, in addition, filed a

petition for cancellation of plaintiff's Trademark Registration.

Plaintiff's filing of this lawsuit in 1997 was a direct and timely response to defendant's tactics. *See Miss Universe, Inc. v. Patricelli,* 271 F.Supp. 104, 110 (D.Conn. 1967), *aff'd,* 386 F.2d 997 (2d Cir.1967) (per curiam) (laches is inapposite where "slow encroachment upon plaintiff's preserve, of increasingly direct competition, and of sudden promotional expansion aimed at exploitation of a market created by plaintiff."). I find that plaintiff was not guilty of unreasonable delay.

### C. *The Third Factor: Prejudice*

The defense of laches also requires a showing of prejudice resulting from plaintiff's alleged delay in filing suit. *Carl Zeiss, supra,* 433 F.2d at 704 ( "mere passage of time cannot constitute laches"). Defendant fails to make such a showing and, for this reason also, its defense of laches must fail. *See Conopco,* 95 F.3d at 192, *quoting Goodman v. McDonnell Douglas Corp.,* 606 F.2d 800, 808 n. 17 (8th Cir.1979) (to prove laches, defendant must ·show a change in position in a way that would not have occurred if the plaintiff had not delayed in bringing the action).

Defendant claims that its purchases of real estate and equipment for its East Side store in 1997 and 1998 show prejudice from plaintiff's delay. *See* Weinstein Reply Dec. Ex. B. But, by 1997 and 1998, Plaintiff had already filed this suit. Prejudice cannot normally be claimed for expenses incurred after the parties were contesting their respective trademark rights. *Tri–Star Pictures,* 14 F.Supp.2d at 361. Other miscellaneous investments and renovations made to maintain the business also do not show a change in position due to alleged delays by the plaintiff in bringing suit. *See Cuban Cigar, supra,* 457 F.Supp. at 1098 (more is required to show

prejudice "than the simple fact that the business continued during the period of delay.").[19]

I thus find that defendant has not shown sufficient facts in support of its defense of laches to raise a triable issue of fact.

### *Appropriate Relief*

█ My findings that the defendant's use of "H & H Bagels East" is likely to cause confusion with plaintiff's tradename "H & H Bagels," and that plaintiff is not barred from suing by limitations or laches do not end the analysis, nor give rise to automatic injunctive relief. Trademark remedies are remedial, and equity commands that injunctive relief should be "no broader than necessary to cure the effects of the harm caused." *George Basch v. Blue Coral, Inc., quoting Soltex Polymer Corp. v. Fortex Ind., Inc.,* 832 F.2d 1325, 1329 (2d Cir.1987); *but see Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.,* 832 F.2d 1311, 1315 (2d Cir.1987).

Defendant, like plaintiff, acquired its interest in good faith from the Bankruptcy Examiner. Defendant acquired both the assets of the East Side store and, by implication, the good will inhering in the name under which the East Side store did business: "H & H Midtown Bagels East." Defendant may continue to use that name, in its regional area and wherever else it wishes to market or advertise its products. I rule, however, that it may not refer to itself as "H & H Bagels East," or "H & H East," for experience has shown that that shortened name was too easily confused by consumers with H & H Bagels. I rule further, that because of the likelihood of confusion, defendant, in referring to itself as "H & H Midtown Bagels East", shall also add a disclaimer that it is not affiliated with "H & H Bagels." *See, e.g., Lubovsky, Inc. v. Esprit De Corp.,* 627 F.Supp.

**19.** In *Cuban Cigar,* 457 F.Supp. at 1098, the court explained: "Defendant's sales, even in that portion of time for which evidence was introduced, were never extensive. That, of course, does not mean that plaintiff was free to disregard defendant with impunity until such time as defendant's efforts made the threat sufficiently immediate to warrant action. But until 1972, defendant did no advertising; after that date and until 1974, it advertised only intermittently in trade journals. And until 1974, defendant did virtually the same amount of annual business."

483, 496 (S.D.N.Y.1986) (crafting injunction that "will not excessively deprive defendant of the benefit of the valuable good-will it has built up ... but which requires the defendant to take more effective steps to distinguish its mark....").

I rule, further, that plaintiff should also add a disclaimer that it is not affiliated with "H & H Midtown Bagels East." At the argument, plaintiff argued that requiring it to disclaim would draw attention to the second comer and magnify it in the public mind.[20] Whether that be true or not, I rule that the greater interest is to avoid the likelihood of confusion to the consuming public, and requiring each party to disclaim affiliation with the other will serve that interest and, in addition, give due recognition that both acquired valuable, albeit different, interests from the Bankruptcy Examiner. *See McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1140 (2d Cir.1979) (appropriate to balance conflicting interests of parties, to reach equitable and non-draconian solutions to trademark disputes) *overruled on other grounds by Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1043–44 (2d Cir.1992).

I direct the parties to confer on the language appropriate to an injunction and a disclaimer, and to submit to me, within 20 days from the date of this decision, a single form of judgment showing, to the maximum extent their agreements and disagreements, supported by a brief statement, again in a single document, supporting their respective positions regarding any disagreements.

Accordingly, I grant in part, and I deny in part, plaintiff's motion, and defendant's cross-motion, for summary judgment. In light of these holdings, defendant's remaining counterclaims are also dismissed.

SO ORDERED.

---

**20.** Oral Arg. Tr., Sept. 7, 1999 at pp. 34–5.